## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

JASON CLOPTON and DEANDRE JUNE,

                    Plaintiffs,

v.

CITY OF PLYMOUTH, JEFF DORFSMAN,
SARA PHILLIPPE, DAN RAQUET,
SERGEANT WILSON, and WILLIAM DANE,

                    Defendants.

Civil No. 14-3369 (JRT/SER)

**MEMORANDUM OPINION
AND ORDER**

---

Thomas J. Lyons, **LYONS LAW FIRM, P.A.**, 367 Commerce Court, Vadnais Heights, MN  55127, for plaintiffs.

Jason M. Hiveley, **IVERSON REUVERS CONDON**, 9321 Ensign Avenue South, Bloomington, MN,  55438, for defendants.

This case arises out of the self-help repossession of Plaintiff Jason Clopton's automobile.  On June 3, 2014, repossession agents attempted to repossess Clopton's Chrysler Aspen from the underground parking garage of his apartment complex, but were interrupted by Plaintiff DeAndre June, one of Clopton's friends who also had a part-time job performing security-related duties for the apartment complex.  A dispute ensued, and June moved his personal car to block the agents from leaving with the Aspen. Eventually, three City of Plymouth (the "City") police officers arrived at the scene, as did Clopton.  According to Clopton, both he and June objected to the repossession.  The officers, however, threatened to arrest June if he did not move his car.  June complied, and the Minnesota Recovery Bureau, Inc. ("MRB") agents left with the car.

Clopton and June commenced this 42 U.S.C. § 1983 action against the City and the individual police officers (the "Police Defendants").  Clopton alleges that the Police Defendants deprived him of his property – the Aspen – without due process, and that the City failed to train its officers and had illegal policies and customs.  June also brings claims against the Police Defendants, alleging that they violated his constitutional right to perform his security-related duties, unlawfully repossessed Clopton's car, and unreasonably seized him by threatening to arrest him in violation of the Fourth Amendment.  The Police Defendants and the City now move for summary judgment on all claims.

Because there are genuine factual disputes regarding what occurred on June 3, 2014, the Court will decline to find that the Police Defendants are entitled to qualified immunity for Clopton's claims.  Viewing the evidence in the light most favorable to Clopton, a reasonable fact-finder could conclude that the Police Defendants violated Clopton's clearly established constitutional rights by unlawfully aiding in the private repossession.  However, the Court will grant summary judgment for the Police Defendants and the City on all other claims.  Clopton has not offered evidence sufficient to show that the City failed to train its officers or had illegal policies and customs, and the Police Defendants are entitled to qualified immunity from June's claims because June has not shown that he was deprived of any constitutional rights.

## BACKGROUND

### I.   FACTUAL HISTORY

Plaintiff Jason Clopton purchased a 2009 Chrysler Aspen in 2013 and financed it with a loan from Capital One.  (Second Am. Compl. ¶ 16, Mar. 10, 2016, Docket No. 75.)  The loan agreement required Clopton to make monthly installment payments, but Clopton struggled to pay on schedule and made numerous late and partial payments. (*Id.* ¶ 20.)  Capital One accepted Clopton's irregular payments for a time, but eventually decided to pursue self-help repossession.  (*Id.* ¶ 24-25.)  Capital One hired MRB to recover Clopton's vehicle.  (*Id.* ¶ 25.)[1]

On the evening of June 3, 2014, the husband-and-wife team of Brian and Carolyn Halberg, agents of MRB, went to Clopton's residence at the Granite Woods Apartment Complex in Plymouth, Minnesota in search of Clopton's vehicle.  (*See* Aff. of Brian P. Taylor ("Taylor Aff."), Ex. 4 ("B. Halberg Dep.") at 20:15-20, Mar. 11, 2016, Docket No. 78.)  Granite Woods is a multi-family housing complex with several hundred tenants. The complex has an enclosed parking garage, which sits beneath one of the apartment buildings on site.  (*Id.*, Ex. 5 ("Nunally Dep.") at 20:18-21:5.)  The garage is accessible through several garage doors, which open when activated by a remote control.  (*See id.*, Ex. 15 at 50:4-20.)  The garage is for tenants of the complex, who have assigned spaces. (*See id.*, Ex. 14 ("Reihsen Dep.") at 45:2-13.)

---

[1] Clopton alleges that Capital One, and by extension MRB, lacked the legal authority to repossess his car because he never received a strict-compliance notice, as required under Minnesota law.  (*Id.* ¶¶ 20-24.)  According to Clopton, Capital One attempted to send him the required notice, but made a typo in his address.  (Aff. of Brian P. Taylor ("Taylor Aff."), Ex. 7 ("Clopton Dep.") at 36:2-37:3, Mar. 11, 2016, Docket No. 78.)

When the Halbergs arrived, they observed that one of the garage doors was open and Clopton's Chrysler Aspen was parked inside. (*Id.*, Ex. 2 ("C. Halberg Dep.") at 44:9-45:4; B. Halberg Dep. at 52:9-22.) The Halbergs called another MRB employee, Ben Gallop, and asked him to bring a tow truck. (C. Halberg Dep. at 45:8-17.) When Gallop arrived, the group attempted to drive the tow truck into the garage, but it was too big. (*Id.* at 48:9-13; B. Halberg Dep. at 53:4-7.) Because the tow truck would not fit, the Halbergs instead decided to manually move Clopton's car from its parking spot to the garage door opening, where they could attach it to the tow truck parked outside. (B. Halberg Dep. at 53:6-12.) To do this, they affixed devices called "GoJaks" to two of the vehicle's tires. (*Id.* at 53:16-18; C. Halberg Dep. at 47:13-49:9.) GoJaks are "pieces of equipment that lift up . . . the drive tires of the vehicle so that you can move [the vehicle] freely." (C. Halberg Dep. at 47:17-20.)

Before the Halbergs could move the car to the open garage door and attach it to the tow truck, however, they were interrupted by Plaintiff DeAndre June. (C. Halberg Dep at 50:15-18; B. Halberg Dep. at 53:25-54:7; Taylor Aff., Ex. 3 ("June Dep.") at 33:16-22.) June was a tenant at Granite Woods who also had a part time job performing security-related duties for the complex. (June Dep. at 7:9-23.) The Halbergs testified that they had completely moved the car out of its parking spot and were pushing it in a straight line towards the garage door when June appeared. (C. Halberg Dep. at 50:8-18; B. Halberg Dep. at 53:19-54:7.) June, on the other hand, testified that the car was still in its parking spot when he arrived, and that while the GoJaks had been affixed to the tires, only one of the wheels was off of the ground. (June Dep. at 35:9-36:1.)

June told the MRB employees that he was a security guard for Granite Woods, that the vehicle belonged to one of his friends, and that he would not allow the group to remove the vehicle from the premises.  (*Id.* at 36:3-8; C. Halberg Dep. at 54:4-18.)  The encounter quickly grew tense.  According to the Halbergs and Dustin Lee, another MRB employee who had recently arrived at the garage, June took his shirt off, raised his voice, and became belligerent, insisting that MRB could not leave with the Aspen.  (Taylor Aff., Ex. 6 ("Lee Dep.") at 22:16-22; B. Halberg Dep. at 59:24-25; C. Halberg Dep. at 56:8-12, 72:2-5.)  June also purportedly shoved Brian Halberg.  (Lee Dep. at 23:4-7; C. Halberg Dep. at 72:4-5; B. Halberg Dep. at 14:12-20.)

At some point during the confrontation, June retrieved his own vehicle, a Chevy Tahoe, and positioned it within the garage so that it blocked the path between Clopton's Aspen and the tow truck at the garage's entrance.  (B. Halberg Dep. at 54:13-20; June Dep. at 36:11-12.)  June also directed another car, driven by his wife, to block the Aspen in from behind.  (B. Halberg Dep. at 54:22-55:3; June Dep. at 38:10-14.)  At that time, the Halbergs decided to call the police.  Brian Halberg testified that he wanted the police to come because June was getting "physical," "[h]e had no identification that he was security," "[i]t wasn't his vehicle," he was "trying to prevent the repossession from happening," and the Halbergs "didn't want to deal with him."  (B. Halberg Dep. at 14:15-25.)  Brian Halberg also made the decision to open the Aspen's door using a tool called a "Slim Jim" and sit inside.  (*Id.* at 55:4-15; C. Halberg Dep. at 54:10-12; June Dep. at 38:22-39:1.)  He testified that he took this action because he thought Clopton himself might come to the garage soon, and he wanted to prevent Clopton from driving away

with the car while the GoJaks were still attached to the tires.  (B. Halberg Dep. at 55:4-20.)

Clopton arrived at the scene shortly thereafter.  Clopton had been in his apartment, unaware of the incident, until another Granite Woods tenant, Jay Nunally, came to get him.  (Clopton Dep. at 11:24-12:10.)  Clopton testified that when he entered the garage, the Aspen was "slightly" out of its parking spot and June was talking with the Halbergs.  (*Id.* at 12:12-18.)  According to Clopton, he told Carolyn Halberg that the MRB agents were "not supposed to be" in the garage and could not take his Aspen.  (*Id.* at 15:2-4.)  The Halbergs, on the other hand, testified that Clopton never said anything about trespassing, never said that they could not take his car, and instead acknowledged that he had been expecting his car to be repossessed and simply asked if there was anything he could do to prevent the repossession, to which Carolyn Halberg responded no.  (C. Halberg Dep. at 57:4-16; B. Halberg Dep. at 57:11-14.)  Other witnesses testified that Clopton seemed calm.  Nunally stated that he was "a little surprised" at Clopton's reaction because he "didn't seem to be that upset about" his car being repossessed.  (Nunally Dep. at 41:18-42:1.)  Clopton eventually left the garage and returned to his apartment, while June and the MRB employees continued to argue.

Three police officers from the City of Plymouth – Officers William Dane, Daniel Raquet, and Sara Phillippe – then arrived at the scene in response to the Halbergs' call.  There is conflicting evidence as to what the officers knew before arriving.  Dane wrote in his incident report that he "was dispatched to assist [MRB] with picking up a vehicle."  (Decl. of Thomas Lyons, Ex. 4 ("Dane Report") at 3, Mar. 24, 2016, Docket No. 92.).

But he testified in his deposition that he was dispatched merely in response to a disturbance call and did not know about the repossession until he arrived at Granite Woods. (Taylor Aff., Ex. 8 ("Dane Dep.") at 13:17-25.) Phillippe, on the other hand, conceded that she knew that the disturbance call related to a repossession, but testified that she was dispatched to break up a "possible fight." (Taylor Aff., Ex. 9 ("Phillippe Dep.") at 9:16-19.)

When the officers arrived, they observed June's Tahoe blocking the Aspen and blocking the garage's entrance, impeding traffic. (*See* Dane Dep. at 19:20-25.) June testified that at least three cars were lined up outside of the garage, waiting to get in, when the officers arrived on the scene. (June Dep. at 40:16-41:2, 61:1-25.) June also testified that he was "yelling" at the MRB employees. (*Id.* at 58:6-19.) Dane testified that June was "very loud," "yelling," "swearing," and "acting belligerent." (Dane Dep. at 14:11-13, 35:21-36:9, 38:7-15.) Phillippe testified that June "was getting pretty upset" and was "threatening the repo employees." (Phillippe Dep. at 12:21-24.) And Raquet testified that June was "yelling and screaming." (Raquet Dep. at 19:9.)

Dane spoke with June first. (Dane Dep. at 15:5-9.) June identified himself as a security guard with Granite Woods and told Dane that the MRB employees were trespassing in the garage. (*Id.* at 23:21-24:3; June Dep. at 58:19-25.) Dane conceded in his deposition that he did not inquire into or investigate June's trespassing claims. (Dane Dep. at 27:15-22.) Phillippe and Racquet also testified that they did not investigate whether the MRB agents were trespassing in the garage. (Phillippe Dep. at 16:18-23; Racquet Dep. at 14:16-23.) Dane additionally noted that he did not observe any "no

trespassing" signs within the garage, (Dane Dep. at 31:5-18), but several other witnesses testified that there were "no trespassing" signs posted at the garage's entrance, (*see* June Dep. at 47:16-48:1; Clopton Dep. at 41:22-42:10; Reihsen Dep. at 62:7-24).

Dane next spoke with one of the MRB agents, although it is not clear which one. The agent told Dane that MRB was there to repossess the Aspen, June "was almost starting a fight," and the group called the police because they did not "want to get into a physical altercation" with June. (Dane Dep. at 20:21-21:4.) Dane then "verified" that the employee had the "proper paperwork" relating to the repossession. (*See id.* at 22:14-22.) Phillippe also apparently spoke with Brian Halberg. According to Halberg, Phillippe first asked to see MRB's repossession order, which Halberg provided. (B. Halberg Dep. at 57:23-58:1.) Then, after Halberg told Phillippe that he was not going to "get out of the vehicle," Phillippe purportedly agreed, stating, "No. You're just doing your job." (*Id.* at 58:1-3.)

Dane also spoke to Clopton, who returned to the garage for a second time at around the time the officers arrived. Clopton testified that he told Dane that the MRB agents were not supposed to be in the garage, and that he asked Dane to prevent them from repossessing his car. (Clopton Dep. at 17:23-18:8.) According to Clopton, Dane told him in response: "[W]e're going to let them take the car." (*Id.* at 18:2-4.) Dane, by contrast, testified that Clopton did not object to the repossession and instead told him that "he was expecting the vehicle to be taken." (Dane Dep. at 46:23-47:9.) After their conversation was over, Clopton collected a few personal items from the Aspen and left the garage, returning to his apartment for good. Clopton testified that he left the scene at

June's direction, believing that June would "handle" the situation on his behalf and prevent his car from being repossessed. (Clopton Dep. at 15:10-12.)  Prior to leaving, Brian Halberg asked Clopton for his keys, but Clopton declined to turn them over. (B. Halberg Dep. at 56:18-22, 78:11-16.)

With the stand-off between June and the MRB agents still unresolved, Dane decided to call one of his supervisors, Plymouth Police Sergeant Kevin Wilson, to get his "opinion" on how to proceed – Dane "didn't know" the relevant law and had never dealt "with repossessions" before. (Dane Dep. at 25:12-26:2.)  Dane testified that he told Wilson that a vehicle had been repossessed; the owner was not disputing the repossession; and a man identifying himself as a security guard for Granite Woods, with no affiliation to the Aspen, was preventing the tow truck from leaving. (*Id.* at 26:15-27:11, 29:10-16.)  In response, Wilson told Dane that MRB had "the right to pick up the vehicle on behalf of the bank," the repossession was "legal," and Dane should "tell the security officer" to move his car and "let [the MRB employees] get out of there." (Dane Report at 3; *see also* Dane Dep. at 30:19-31:1; Wilson Dep. at 21:3-15.)

After speaking with Wilson, Dane reengaged with June and the two began to argue; according to Dane, June "got very irate and belligerent." (Dane Dep. at 32:2-3.)  At that point, Dane told June that he needed to move his Tahoe. (*Id.* at 32:3-7.)  Dane testified that he made this decision based on his assessment that the MRB employees had already repossessed the car; his conversation with Wilson; and his assessment that, because June was objecting to the alleged trespass, the "easiest solution" would be to

"tell June to move his vehicle . . . and get the guy out of there that June doesn't want to be there in the first place." (*Id.* at 36:14-37:3.)

June initially objected and refused to move his Tahoe, but Dane threatened to place June under arrest if he did not comply. (June Dep. at 67:13-20; Dane Dep. 32:3-11.) June's wife, who was also at the scene, told June that he should cooperate to avoid being arrested. (June Dep. at 62:10-22.) June also spoke to one of the Granite Woods' managers by phone, who told him, "[M]ove your car and we'll deal with it later." (*Id.* at 62:23-63:3.) Eventually, June relented and moved his Tahoe. (*Id.* at 23-24.) With the Tahoe out of the way, the MRB agents pushed the Aspen to the garage door opening, connected it to the tow truck, and drove away with Clopton's vehicle. (*See* Dane Report at 3; C. Halberg Dep. at 72:8-73:2.) Also, several cars that had been lined up outside of the garage were able to pull in and park. (Lee Dep. at 32:16-20.)

After the MRB employees towed the Aspen away, June continued to argue with the officers. At some point, June called 911 and demanded to speak with a sergeant about what had occurred. (June Dep. at 70:9-13.) Plymouth Police Sergeant Jeff Dorfsman came to the scene and spoke with June about June's concerns. June, however, did not believe that Dorfsman was listening to him, and so he ended the meeting. (*Id.* at 66:17-25.)

June testified that but for the police's involvement, he would not have moved his car or backed down from preventing the MRB employees from repossessing Clopton's vehicle. (June Dep. at 44:15-45:25.) Brian Halberg, on other hand, testified that although the Tahoe partially blocked the Aspen's path to the open garage door, he

believed that he could have maneuvered it around the Tahoe with the help of his wife, Gallop, and Lee.  (B. Halberg Dep. at 65:8-25, 67:16-21.)  Brian Halberg further testified that he would not have taken the vehicle off of the GoJaks or relinquished possession.  (*Id.* at 78:7-15.)  But he also noted that the vehicle was too heavy for one person alone to push it around the Tahoe.  (*Id.* at 65:8-14.)

## II.    PROCEDURAL HISTORY

Clopton and June commenced this action on September 5, 2014, bringing § 1983 claims against Dane, Phillippe, Racquet, Wilson, and Dorfsman ("Police Defendants"), and the City of Plymouth (the "City").  Clopton alleges that the Police Defendants violated his constitutional rights under the Fourteenth Amendment by depriving him of his property – the Aspen – without due process.  Clopton also brings claims against the City, alleging that it failed to train its officers on how to deal with self-help repossessions, and employed illegal policies and customs.  And finally, June alleges that the Police Defendants violated his constitutional right to enforce security measures at Granite Woods, violated his constitutional rights based on their repossession of Clopton's vehicle, and violated his Fourth Amendment right to be free from unreasonable seizures by threatening to arrest him if he did not move his Tahoe.  The Police Defendants and the City now move for summary judgment on all of the above claims.

# ANALYSIS

## I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247-49).

## II.     CLOPTON'S CLAIMS AGAINST THE POLICE DEFENDANTS

Clopton brings § 1983 claims against the Police Defendants, arguing that they violated his rights under the Fourteenth Amendment by depriving him of his vehicle, the

Aspen, without due process.  The Police Defendants now move for summary judgment, arguing that they are entitled to qualified immunity.

Police officers are entitled to qualified immunity for § 1983 claims "unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." *Yowell v. Combs*, 89 F.3d 542, 544 (8th Cir. 1996).  In evaluating whether qualified immunity applies, the Court considers two questions, which it may examine in either order:

> (1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted.

*Vaughn v. Greene Cnty., Ark.*, 438 F.3d 845, 850 (8th Cir. 2006); *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009).  "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law.  But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Wimbley v. Cashion*, 588 F.3d 959, 961 (8th Cir. 2009) (quoting *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003)).

## A.    Constitutional Violation

As an initial matter, the parties do not dispute that Clopton had a possessory interest in the Aspen that was protected against state action under the Fourteenth

- 13 -

Amendment of the Constitution.  Thus, for Clopton to succeed on his § 1983 claim, he must show that the Police Defendants' involvement in the private repossession constituted "state action" – in other words, that the officers became so entangled in the events of June 3 that what started out as a purely private repossession was transformed into a state-driven repossession.  *See Moore v. Carpenter*, 404 F.3d 1043, 1046 (8th Cir. 2005).  In the private repossession context, "there is no state action if the officer merely keeps the peace, but there is state action if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not have occurred without the officer's help."  *Id.*  Moreover, "[s]tates are held responsible for private conduct only when the state has exercised coercion or significantly encouraged the conduct, not when the state has merely acquiesced in a private party's initiatives."  *Id.* (citing *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).

Here, the Police Defendants make two arguments for why their conduct did not amount to state action and thus, a constitutional violation:  (1) the repossession was already complete as a matter of law when they arrived on the scene, meaning that they could not have assisted in it; and (2) even if the repossession was not complete, they acted merely to prevent a breach of the peace and the repossession would have occurred even without their involvement.  The Court, however, is unpersuaded by both arguments.

In Minnesota, a self-help repossession is lawful if it "proceeds without breach of the peace."  Minn. Stat. § 336.9-609(b)(2).  But if a repossessor gains sufficient control over the collateral before a breach of the peace occurs, the repossession is deemed to be complete and a subsequent breach of the peace will not render the repossession unlawful.

*See Thompson v. First State Bank of Fertile*, 709 N.W.2d 307, 311 (Minn. Ct. App. 2006); *James v. Ford Motor Credit Co.* and *Thompson v. First State Bank of Fertile,* 842 F. Supp. 1202, 1209 (D. Minn. 1994) ("Once a repossession agent has gained sufficient dominion over collateral to control it, the repossession has been completed."). While there is no precise definition for "breach of peace" under Minnesota law, courts generally consider five factors: "(1) where the repossession took place, (2) the debtor's express or constructive consent, (3) the reactions of third parties, (4) the type of premises entered, and (5) the creditor's use of deception." *Clarin v. Minn. Repossessors, Inc.*, 198 F.3d 661, 664 (8th Cir. 1999). Therefore, not only are the actions and conduct of a repossessor considered to determine whether a breach of peace occurred, but also the reactions of a third party and the debtors. *Id.* Courts have also held that "no violence or threat of violence need occur before a breach of the peace may be found." *Bloomquist v. First Nat'l Bank of Elk River*, 378 N.W.2d 81, 85-86 (Minn. Ct. App. 1985). And lastly, courts have recognized that a trespass can constitute a breach of the peace. *See id.* at 86 (holding that breaking and entering into a business to repossess collateral constituted a breach of the peace as a matter of law); *Akerland v. TCF Nat'l Bank of Minn.*, No. 99-1537, 2001 WL 1631440, at *3 (D. Minn. June 11, 2001) ("[A]ny underlying offense, such as trespass, could suffice to constitute breach of the peace.").

The basis for the Police Defendants first argument is that the repossession was complete as a matter of law before they arrived on the scene because the MRB agents had gained sufficient control of the Aspen by attaching GoJaks to its wheels. According to the Police Defendants, they could not have assisted with the repossession because it was

already over; thus, there was no state action, no constitutional deprivation, and qualified immunity must apply.  But this argument is premature – two predicate factual disputes prevent the Court from finding that the repossession was actually complete when the officers arrived.

First, even if the Court were to assume that putting a car on GoJaks is sufficient to establish control, there is a genuine factual dispute regarding whether June breached the peace before the MRB agents finished their installation of the GoJaks.  While the Halbergs testified that the vehicle was on GoJaks and out of its parking spot before June intervened, June has offered testimony to the contrary – according to him, the vehicle was still in its parking spot and only one wheel was off of the ground.  And the record also reflects that June ripped his shirt off, raised his voice, became belligerent, and purportedly shoved Brian Halberg, conduct which the Court finds sufficient to constitute a breach of the peace.  If June's testimony is to be believed and if he breached the peace before the MRB agents finished installing the GoJaks, then it cannot be said the MRB agents had control of the vehicle and completed the repossession prior to the officers' arrival.  The Court, however, cannot resolve this factual dispute on summary judgment.

Second, there is also a genuine factual dispute regarding whether the MRB agents trespassed in the parking garage.  Minnesota courts have acknowledged that repossession agents have a "privilege to enter another's land for the purpose of taking possession of the collateral if the entry is reasonably necessary in order to take possession"; such an entry is not a trespass.  *Thompson*, 709 N.W.2d at 312 (finding that a repossessor did not breach the peace by entering the debtor's driveway).  Yet this privilege is predicated on at

least three factors:  the debtor must have defaulted on his or her debt, the creditor must have a present right to repossess the vehicle, and the entry must be reasonably necessary in order to take possession of the vehicle.  *See Moore v. Capital One, N.A.*, No. 14-4745, 2016 WL 1627604, at *2 (D. Minn. Apr. 22, 2016); *Thompson*, 709 N.W.2d at 312. Courts have also recognized that when "debtors specifically object to repossession, they revoke any implied right previously granted to the creditors to enter the debtor's property without consent." *James v. Ford Motor Credit Co.*, 842 F. Supp. 1202, 1208 (D. Minn. 1994), *aff'd*, 47 F.3d 961 (8th Cir. 1995).  And this is significant because "[e]ntering the debtor's property after consent is revoked constitutes breach of the peace." *Id.*

Here, Clopton disputes that MRB had a present right to repossess the Aspen because Capital One allegedly did not send him notice of its intent to repossess, as is required under Minnesota law.  Clopton has also offered evidence that he revoked the MRB agents' privilege to be in the garage by objecting to the entry.  And there is an unresolved factual question as to whether the entry itself was reasonably necessary in order to take possession of the Aspen.  If Clopton is to be believed or if the entry was not reasonably necessary, then the MRB agents' presence could have constituted a trespass and breach of the peace, and they did not complete the repossession prior to the officers' arrival.  Because the Court cannot resolve these factual issues on summary judgment, the Court rejects the Police Defendants' first argument.

The Police Defendants' second argument – that even if the repossession was not complete by virtue of the GoJaks, they simply kept the peace and the repossession would

have occurred even without their involvement – also fails based on unresolved factual disputes.

The Police Defendants argue that June was belligerent and blocking traffic, and ordering him to move his car was a reasonable solution to end the standoff and keep the peace. The Police Defendants also cite testimony from Brian Halberg, who stated that he could have pushed the Aspen around June's car and reached the tow truck. The Police Defendants rely on this testimony as evidence that even if they had not ordered June to move his car, the agents still would have completed the repossession. But the Police Defendants overlook numerous key factual disputes.

First, there is ample evidence, when viewed in the light most favorable to Clopton, that the officers did more than simply keep the peace and instead "exercised coercion" or "significantly encouraged" the MRB agents' conduct. *Moore*, 404 F.3d at 1046. This includes evidence that:

- Dane wrote in his incident report that he was dispatched to the garage to "assist" with a repossession.
- The officers ignored Clopton's apparent revocation of consent for the MRB agents to be in the garage.
- The Police Defendants allowed the agents to leave with the Aspen, even though Clopton's revocation of consent possibly rendered their continued presence a breach of the peace.
- Dane told Clopton, after Clopton revoked consent, that the officers were going to let the agents leave with the car.
- Dane testified that he did not investigate June's claims that the MRB agents were trespassing in the garage.
- Dane testified that he ordered June to move his Tahoe in part because Wilson told him that the repossession was "legal."

- Brian Halberg testified that Phillippe told him that he did not have to relinquish the Aspen because he was just doing his job.
- Dane threatened to arrest June if he did not move his Tahoe.
- The Police Defendants did not direct the MRB agents to move their tow truck, which was also allegedly blocking traffic into the garage.
- The Police Defendants did not check state title records for the Aspen and instead relied on repossession paperwork provided by the MRB agents.

There is also ample evidence to support a finding that but for the Police Officers' affirmative intervention, the repossession would not have occurred. Although Brian Halberg testified that he could have maneuvered the Aspen around June's vehicle, June testified that he would not have allowed this to happen and would have remained in the garage for as long as it took to stop the repossession. Based on this evidence, a reasonable factfinder could conclude that the Police Defendants went beyond keeping the peace and instead affirmatively aided the MRB agents enough that the repossession would not have occurred without their help.

The Court will thus decline to apply qualified immunity based on prong one of the relevant test. Genuine factual disputes prevent the Court from finding that there was no state action and no deprivation of a constitutional right.

## B.    Clearly Established

The second prong of the qualified immunity test requires the Court to evaluate whether the Police Defendants violated a constitutional right that was clearly established at the time of the deprivation such that a reasonable official would understand that his conduct was unlawful in the situation he confronted. The Police Defendants argue that

even if they deprived Clopton of a constitutional right, a reasonable officer in their shoes would not have known that their conduct was unlawful.  They first note that no court has ever decided whether attaching GoJaks to a vehicle amounts to control sufficient to complete a repossession; because of this, a reasonable officer could have believed that the repossession was already complete when they arrived on the scene.  Second, they argue that it was not clearly established that officers could not allow repossession agents to leave the premises with collateral in order to prevent a potential physical altercation.  And third, they argue that courts have consistently recognized that the question of whether officer conduct amounts to state action in a repossession case is "fact-sensitive" and "complicated," and it was not unreasonable for officers to order June – a third party with no apparent connection to the Aspen – to move his car to end the standoff, particularly when Clopton himself had already left the scene.

But the Court is not persuaded.    First, to the extent the Police Defendants argue that a reasonable officer could have determined that the repossession was complete because there is no case law addressing GoJaks, this argument fails based on evidence that (1) Dane ignored pleas from June and Clopton that the MRB agents were trespassing and were not allowed in the garage, respectively; and (2) the Police Defendants ignored posted "no-trespass" signs."  Under Minnesota law, it was clearly established at the time of the incident that a self-help repossession cannot proceed if it results in a "breach of the peace."  Minn. Stat. § 336.9-609(a).  And it was also clearly established that a trespass can constitute a breach of the peace.  *See Bloomquist*, 378 N.W.2d at 85-86; *see also Akerland*, 2001 WL 1631440, at *3; *James*, 842 F. Supp. at 1208.  If the Police

Defendants failed to conduct even a cursory investigation into whether the agents were trespassing, then they could not have reasonably concluded that the repossession was complete based solely on the GoJaks.

Second, to the extent the Police Defendants argue that it was not clearly established that they could not allow the MRB agents to leave with the Aspen to prevent a physical altercation, this argument also fails based on the non-existent inquiry into whether the agents had a right to be in the garage. If the agents were in fact trespassing, then this breach of the peace would have rendered the repossession unlawful, and a reasonable officer in the Police Defendants' shoes would have ordered the MRB agents to put the car back in its spot and leave the premises, in addition to ordering June to move his car.

Third and finally, to the extent that the Police Defendants argue that state action in the repossession context is "fact-sensitive" and "complicated," the Court agrees. But this uncertainty actually weighs against a finding that qualified immunity should apply. It may very well be that the Police Defendants' conduct was reasonable in light of clearly established law. Yet viewing the evidence in the light most favorable to Clopton, there are genuine factual disputes as to (1) whether the MRB agents were trespassing in the garage or had a privilege to be there; (2) whether the agents' entry into the garage was reasonably necessary to take possession of the Aspen; (3) whether Clopton objected to the agents' entry and the repossession; (4) whether the Police Defendants could have determined, through a reasonable investigation, that the agents were trespassing or that there was a breach of peace before the agents put the vehicle on GoJaks; (5) whether the

Police Defendants affirmatively intervened on the side of the agents and did more than keep the peace, and (6) whether the Police Defendants ultimately violated clearly established law by providing enough aid that the repossession would not have occurred without their help.

Accordingly, the Court will decline to apply qualified immunity, and deny the Police Defendants' motion for summary judgment on this claim.[2]  Unresolved factual questions about what happened on June 3, 2014, prevent the Court from concluding that the Police Defendants' acted reasonably based on clearly established law and the information available to them.

## III.    CLOPTON'S CLAIMS AGAINST THE CITY

Clopton also brings § 1983 claims against the City, arguing that he was deprived of his Aspen without due process because the City failed to train the Police Defendants about self-help repossessions and because of the City's allegedly illegal policies and customs relating to self-help repossessions.   Neither claim, however, can survive summary judgment.

### A.    Failure to Train

A municipality cannot be held vicariously liable for the actions of its police officers under § 1983, but it may be held directly liable for constitutional violations based on a failure to train.  *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (citing *Monell v.*

---

[2] The Court will, however, grant summary judgment for Dorfsman based on qualified immunity.  Clopton conceded at the hearing that there was no evidence to support a claim against him.

*Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1978)).   To succeed on a failure-to-train claim, the plaintiff must show that the municipality's failure to train amounts to "deliberate indifference to the rights of persons with whom the untrained [officers] come into contact." *Id.* at 61 (2011) (quoting *Canton v. Harris,* 489 U.S. 378, 388 (1989).   The "deliberate indifference" standard is a "stringent" one, "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* "A pattern of similar constitutional violations by untrained [officers] is 'ordinarily necessary' to demonstrate deliberate indifference." *Id.* at 62 (quoting *Bryan Cty.,* 520 U.S., at 409, 117 S. Ct. 1382).   This is the case because a pattern puts the municipality on notice "that a course of training is deficient in a particular respect." *Id.* Without such notice, "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

"[I]n a narrow range of circumstances," a pattern is unnecessary to show deliberate indifference and a municipality may be held liable for failure to train based on a single incident. *Id.* at 63. However, for "single-incident" liability to apply, "the unconstitutional consequences of failing to train" must be "patently obvious." *Id.* at 63-64.

Here, Clopton argues that the City failed to train its officers "about the legal landscape in self-help repossession in Minnesota." (Pls.' Opp'n Mem. at 25, Apr. 1, 2016, Docket No. 95.) As evidence, Clopton points out that all five Police Defendants involved in this case testified that they did not know anything about self-help repossessions. (Dane Dep. at 8:24-9:2; Phillippe Dep. at 6:25-7:1; Raquet Dep. at 6:10-

12; Wilson Dep. at 14:24-15:10; Taylor Aff., Ex. 10 at 6:17-19.)  Clopton also notes that Granite Woods management had previously reported to the Plymouth police department that repossessers had trespassed in the garage at issue, and the department apparently did not disseminate this information to its officers.  (*See* Decl. of Thomas Lyons, Ex. 1 at 2, Apr. 1, 2016, Docket No. 96.)

While Clopton's evidence may highlight an area for improvement in the City's training, the Court finds that it does not rise to the level of showing deliberate indifference.  Clopton points to no evidence that there was a pattern of unconstitutional entanglements in private repossessions in Plymouth prior to June 3, 2014.  Absent evidence of a pattern, it can hardly be said that Plymouth officials deliberately elected to forego training that they knew or should have known would result in constitutional violations.  Furthermore, Clopton makes no argument that the unconstitutional consequences of failing to train about self-help repossessions were so patently obvious that single-incident liability should apply.  Simply put, Clopton has not met his high threshold of showing deliberate indifference.  The Court will accordingly grant summary judgment for the City on this claim.

### B.    Illegal Policy or Custom

A municipality may also be held liable under § 1983 for an illegal policy or custom.  To succeed on this claim, the plaintiff must show that a "municipal policy or custom is the moving force behind a constitutional violation."  *Wedemeier v. City of Ballwin, Mo.*, 931 F.2d 24, 26 (8th Cir. 1991).  Here, Clopton has failed to specifically

identify any policy or custom that led to his alleged constitutional deprivation, let alone that one was the moving force.  And to the extent Clopton argues that the City's purported failure to train in and of itself constituted an illegal policy or custom, that argument fails because "an isolated incident of police misconduct by subordinate officers is [generally] insufficient to establish municipal policy or custom."  *Id.*  The Court will thus grant summary judgment for the City on this claim.

## IV.   JUNE'S CLAIMS AGAINST THE POLICE DEFENDANTS

June brings § 1983 claims against the Police Defendants, alleging that they committed various constitutional violations during the course of the June 3 confrontation. But the Court will grant summary judgment for the Police Defendants on qualified immunity grounds because June has not established that the Police Defendants violated any of his constitutional rights.

June first alleges that the Police Defendants violated his constitutional right to enforce security measures in his capacity as a security guard at Granite Woods.  But June has offered no case law to show that such a constitutional right exists, let alone that it was a clearly established right.  And even if such a constitutional right did exist, June could not invoke it because he was ineligible to be a security guard in the State of Minnesota as of June 3, 2014.  June admitted that Granite Woods did not do a background check on him when he was hired, (June Dep. at 12:1-13:4), and Minnesota law requires background checks for all individuals hired to be security guards for private businesses, *see* Minn. Stat. §§ 326.32, subd. 10c, 326.336, subd. 1, .3381, subd. 1a.  June further

conceded that he has at least three felony convictions, (June Dep. at 17:13-18:10), which disqualifies him under Minnesota law from being employed as a security guard, *see* Minn. Stat. §§ 326.32, subd. 10c, 326.336, subd. 1, .3381, subds. 1a, 3.   The Police Defendants are accordingly entitled to qualified immunity on this claim – they did not violate June's nonexistent constitutional right.

June next alleges that the Police Defendants violated his constitutional rights based on the repossession of Clopton's car.   But June is attempting to assert Clopton's property rights, and he lacks standing to do so.   *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (noting that a third party generally lacks standing to assert the rights of another).   The Police Defendants are thus again entitled to qualified immunity.

Finally, June alleges that the Police Defendants violated his Fourth Amendment right to be free from unreasonable seizures by threatening to arrest him if he did not move his Tahoe.   The Fourth Amendment protects "against unreasonable . . . seizures."   U.S. Const. amend. IV.   An individual is "seized" within the meaning of the Fourth Amendment if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."   *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984).   However, a brief seizure is not unreasonable, and therefore does not violate the Fourth Amendment, if "the officer has a reasonable, articulable suspicion that criminal activity is afoot."   *Illinois v. Wardlow*, 528 U.S. 119, 123 (2003).   An officer may also arrest an individual, without violating the Fourth Amendment, if he or she has "probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

Here, the parties agree that Dane seized June within the meaning of the Fourth Amendment by threatening to arrest him if he did not move his Tahoe – the dispute instead centers on whether that seizure was constitutionally reasonable.  June contends that it was not because Dane and the other officers lacked "objective justification."  (Pls.' Opp'n Mem. at 24.)  But the Court is not convinced – the Police Defendants had probable cause that June was violating multiple Minnesota statutes, which justified the brief seizure.

First, Minn. Stat. § 169.34, subdivision 1(a)(2) provides that "[n]o person shall stop, stand, or park a vehicle . . . in front of a public or private driveway."  Here, June's Tahoe indisputably was blocking traffic into the parking garage, and June himself admitted that at least three cars were lined up and waiting to enter.  Based on these facts, the Police Defendants had probable cause that June was violating § 169.34, a petty misdemeanor.  *See* Minn Stat. § 169.34, subd. 2(a).  The brief seizure to alleviate the blockage was thus reasonable and not a violation of June's Fourth Amendment rights.

Second, Minn. Stat. § 609.72, subdivision 1(3) provides that a person "is guilty of disorderly conduct" – a misdemeanor – if he "engages in offensive, obscene, abusive, boisterous, or noisy conduct" and knows or has "reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace."  Here, the Police Defendants observed that June was "very loud," "yelling," "irate," and "belligerent," and that he was attempting to prevent the repossession of a vehicle that was not his.  The officers also had information from the Halbergs that June was allegedly trying to start a fight.  Based on these facts, the Police Defendants had

probable cause that June was guilty of disorderly conduct in violation § 609.72 – his noisy and boisterous conduct was likely to alarm or disturb others and provoke a breach of the peace or assault. The officers were thus constitutionally justified in briefly seizing June to restore order, alleviate the standoff between him and the MRB agents, and keep the peace.

Because June has not shown that the Police Defendants violated his constitutional rights, they are entitled to qualified immunity. The Court will accordingly grant summary judgment for the Police Defendants on all of June's claims.

This case will be placed on the Court's next available trial calendar.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants Motion for Summary Judgment [Docket No. 76] is **GRANTED in part** and **DENIED in part**, as follow:

1.     The motion is **DENIED** with respect to Clopton's § 1983 claim against Dane, Phillippe, Racquet, and Wilson.

2.     The motion is **GRANTED** in all other respects. All other claims against all other Defendants are **DISMISSED with prejudice**.

DATED:  January 3, 2017
at Minneapolis, Minnesota.

_____
s/ John R. Tunheim
JOHN R. TUNHEIM
Chief Judge
United States District Court